* * * * * * * * * * *
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Ledford and the briefs and arguments of the parties. The appealing parties have not shown good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award.
 * * * * * * * * * * *
The Full Commission finds as a fact and concludes as matters of law the following, which were entered into by parties as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission, and the Commission has jurisdiction of this claim.
2. An employer-employee relationship existed between plaintiff and the employer Mission St. Joseph Health System on December 20, 2000 and 31 January 31, 2003.
3. Plaintiff sustained an injury by accident and/or specific traumatic incidents arising out of and in the course of her employment on December 20, 2000 and January 31, 2003.
4. The employer is self-insured and their workers' compensation coverage is managed by their servicing agent, Cambridge Integrated Services.
5. There is no question as to misjoinder or nonjoinder of the parties.
6. The parties submitted as stipulated exhibits, two folders, and some additional documents, which included the following:
 A. Medical records relating to the care and treatment of plaintiff.
 B. Forms 18 and 33 related to plaintiffs claims, as well as other IC documents.
 C. Copies of letters from Anzella Jackson to Deputy Commissioner Edward Garner, Jr.
 D. Administrative Order by Edward Garner, Jr., filed October 14, 2002.
 E. Letter by Gary Dodd to Tracy H. Weaver, Executive Secretary, dated March 26, 2004, with attachments.
 F. Employee/Plaintiff's written report of injury dated February 5, 2003 with attachments.
 G. Plaintiff's statement of time lost from work resulting from compensable injuries of December 20, 2000 and January 31, 2003.
H. Plaintiff's personnel records.
7. The primary issue before the Commission is whether plaintiff is entitled to additional benefits pursuant to the Workers' Compensation Act related to her injuries of December 20, 2000 and January 31, 2003. Defendant contends there is also an issue as to whether defendant is entitled to attorney's fees and costs pursuant to N.C. Gen. Stat. § 97-88.1 for having to defend this action.
 * * * * * * * * * * *
Based upon all the competent evidence from the record, the Full Commission finds as follows:
 FINDINGS OF FACT
1. Plaintiff was born on December 16, 1954 and is currently 52 years of age. She completed high school and received training as a nurse's assistant (CNA). Plaintiff first began working for defendant with geriatric patients in 1995.
2. Plaintiff was employed as a technician in the psychiatry department, a position also known as "psych tech." According to plaintiff, her general duties involved making the patient feel safe in their surroundings, and talking with them to calm them down if they get irritated or agitated. She might also assist patients with physical needs, such as changing a bed, or assisting a patient in taking a bath or using the toilet, or moving from bed to chair. At times, plaintiff may have to assist with restraining an uncontrollable patient.
3. Amanda Hollingsworth is the director of the psychiatry department at Mission Hospitals. Ms. Hollingsworth testified that the psychiatric technicians, or "techs", rotate through two adult units and one geriatric unit. In the adult units, approximately ninety percent of the care involves verbally communicating with the patients as opposed to hands on assistance. The geriatric unit required more hands on care by the technicians with activities such as dressing and feeding. If needed, more than one staff member might be called upon to assist with these tasks depending upon how much the patient was able to help. Ms. Hollingsworth testified that the staff is always encouraged to get assistance, especially with tasks such as lifting.
4. On December 20, 2000, plaintiff sustained a specific traumatic incident to her back while assisting an elderly patient to stand and maintain her balance. The patient grabbed plaintiff's hand and pulled her. Plaintiff felt an onset of pain in her chest and back, and reported it to her supervisor.
5. Following this incident, plaintiff reported to the emergency room, where she underwent x-rays of her chest, ribs, and thoracic spine, which were all reported negative. Plaintiff was assessed with acute back and chest strain and was instructed to place a hot or cold compress on her back. She resumed her regular work duties on December 27, 2000.
6. On December 28, 2000, plaintiff was seen by Dr. Gordon Groh at Blue Ridge Bone and Joint Clinic, who assessed her with mechanical low back pain. Dr. Groh changed her medication and released plaintiff to work full duty, to be seen in 4 to 6 weeks.
7. Plaintiff continued to experience back pain. She came under the care of Dr. Goebel, also at Blue Ridge Bone and Joint Clinic, who initially saw her on January 24, 2001. After examining plaintiff and reviewing her x-rays, Dr. Goebel was of the impression that she was suffering with a lumbar strain. He placed plaintiff on light duty with lifting restrictions of 20 pounds and instructed that plaintiff should have no patient contact in which she may be forced to lift or catch a patient which may injure her back. He also prescribed a course of physical therapy.
8. Plaintiff performed light duty work based upon Dr. Goebel's recommendation. Due to her continued complaints of pain, in April 2001, Dr. Goebel ordered an MRI, followed by a Functional Capacity Evaluation (FCE). The MRI, done on April 28, 2001, revealed minimal degenerative changes of the disc at L2-3, L4-5, and L5-S1 with mild associated disc bulges at the lower levels. Based upon these findings, Dr. Goebel opined that plaintiff was not a surgical candidate, and he followed up with the FCE.
9. The FCE was done on May 4, 2001. This FCE indicated valid results with good effort and showed that plaintiff was capable of working at the light to medium physical demand level with a lifting restriction of 35 pounds. Plaintiff returned to see Dr. Goebel on May 16, 2001, at which time Dr. Goebel reviewed the FCE results, and placed plaintiff at maximum medical improvement with a zero percent (0%) permanent partial impairment (PPI) rating for her injury. Dr. Goebel placed her on "permanent restrictions with no lifting greater than 35 pounds occasionally, 17 pounds frequently and 5 pounds constantly." Dr. Goebel noted that he would see her on an as-needed basis only.
10. Plaintiff continued to work for defendant in the geriatric ward. For the most part, her duties were within the restrictions outlined by Dr. Goebel. She was able to perform her duties on a day-to-day basis. Plaintiff did not seek further medical treatment for her back until March 2002.
11. On March 13, 2002, plaintiff returned to Dr. Hankley, a physiatrist at Blue Ridge Bone and Joint Clinic. She complained of low back and left leg pain. She stated that her symptoms were aggravated by sitting, standing, walking, any position for too long seemed to hurt, and repeated bending and stooping at work aggravated her pain. Plaintiff brought a job description and expressed concern that her employer was going to put her back on the floating pool at work and she was not sure that she could perform the requirements of the job.
12. Dr. Hankley examined plaintiff and reviewed plaintiff's MRI film of April 28, 2001. His impression was that plaintiff was suffering with lumbar strain and persistent pain. Dr. Hankley also reviewed a description of plaintiff's job, and noted that the lifting requirements for the "psych tech" position exceeded the restrictions placed on plaintiff by Dr. Goebel when he last saw her. Dr. Hankley recommended a functional capacity evaluation and a job site analysis by Mike Piercy. Pending the FCE results, Dr. Hankley allowed plaintiff to continue to work within the restrictions given by Dr. Goebel.
13. The functional capacity evaluation was begun on March 19, 2002, but was halted when plaintiff's blood pressure went up to an unacceptable level of 160/110. After plaintiff's blood pressure was brought under better control, the FCE was completed on March 28, 2002. The FCE was conducted by Robert "Mike" Piercy, a certified vocational evaluator. Validity measures indicated that plaintiff was not putting forth maximum effort. Despite the apparent submaximal effort, this FCE demonstrated that plaintiff was capable of working within the medium physical demand level with a lifting restriction of 50 pounds.
14. Mike Piercy also did an on-site job observation. He concluded that the test results showed that plaintiff meets the critical demands of the position of psych. technician with the exception of (constant) bending/stooping and (occasional) crouching/squatting. At the same time, plaintiff demonstrated functional tolerances for occasional bending/stooping and occasional crouching/squatting.
15. On April 16, 2002, Dr. Hankley held a "team conference" with Mary Silver, who administers the workers' compensation program for the Defendant Memorial Mission St. Joseph. The results of the FCE were discussed and it was determined that plaintiff was able to tolerate her job within the restrictions outlined by the FCE. Dr. Hankley called plaintiff himself to advise of this determination, and told her she could return to see him as needed.
16. Subsequently, on August 1, 2002, plaintiff expressed some concern regarding the amount of stooping and bending involved in her job. Modifications of the job were discussed with plaintiff to limit the amount of bending and stooping. An additional team meeting was held in which it was determined that alternatives and adaptive equipment, such as long-handled brushes, should be provided plaintiff so that she could continue working.
17. On October 11, 2002, without the knowledge of the employer, plaintiff herself wrote to former Deputy Commissioner Edward Garner, and requested a second medical opinion. It appears the employer did not have notice of the request or opportunity to respond. On October 14, 2002, Deputy Commissioner Garner entered an order granting plaintiff's request for a second opinion. Although the employer should have been given notice, it was reasonable for plaintiff to request a second opinion.
18. Pursuant to the approval of her second opinion request, on December 13, 2002, plaintiff was examined by Dr. Keith Maxwell, a board certified orthopedic surgeon specializing in spines. Plaintiff's chief complaint involved low back pain. Plaintiff described first injuring her lumbar spine in December 2000 while pulling a patient toward her at work at St. Joseph's Hospital. At that time, Dr. Maxwell reviewed the lumbar spine MRI of April 28, 2001, which he noted revealed mild generalized lumbar degenerative disc disease and spondylosis, mild annular bulging at L4-5 and L5-S1, and no disc herniation or significant spinal canal stenosis. With respect to the source of plaintiff's back pain, Dr. Maxwell opined that she had two-level lumbar degenerative disc disease at L4-5 and L5-S1, rather than at L-3 as indicated in his medical record. Dr. Maxwell determined, consistent with the other examining physicians, that plaintiff was not a surgical candidate.
19. Dr. Maxwell referred plaintiff to Dr. Rudins, a specialist in physical medicine and rehabilitation, for functional restoration and medical management for lumbar disc disease. Dr. Maxwell explained this was not a structured program like work hardening, but that Dr. Rudins manages patients on an individual basis and supervises their non-operative care, including physical therapy, work hardening, functional restoration and prescription medications. In Dr. Maxwell's opinion, the plaintiff's subjective history indicates that the work incidents aggravated underlying two-level degenerative disc disease. Further, in Dr. Maxwell's opinion, Dr. Rudins could offer reasonably necessary treatment for the same.
20. On cross-examination, Dr. Maxwell admitted that he was never provided the medical records regarding plaintiff's treatment with Blue Ridge Bone Joint, and had no records regarding her treatment since he had seen her for one visit on December 13, 2002. He had no information regarding the medications or the type of physical therapy plaintiff had been provided since that time, and based his assessment on her subjective account, as well as the MRI results. Dr. Maxwell agreed that he could not render an opinion whether functional restoration is currently needed.
21. On January 31, 2003 plaintiff walked into the room of one of her patients in the psychiatric ward and found him hanging with a sheet around his neck. Plaintiff lifted the patient and supported him for several seconds until another individual came to assist her. The patient weighed approximately 150 pounds. That evening plaintiff began to experience increased low back pain with pain radiating into the left lateral thigh. She also experienced pain in her left shoulder and trapezius pain on the left side.
22. Following this incident, plaintiff returned to see Dr. Hankley on February 11, 2003. This was her first visit since August 2002. She reported low back pain and left trapezius pain occurring after she assisted a 150-pound patient who was attempting to hang himself. Dr. Hankley assessed plaintiff with muscular strain and released her to return to work, as long as there was no heavy lifting, which he noted he would confirm with Mary Silver
23. Plaintiff returned to see Dr. Hankley on February 13, 2003. Although Dr. Hankley had given her prescriptions for both an anti-inflammatory and muscle relaxer, plaintiff had not filled either prescription. She complained that she was no better. Dr. Hankley advised that she continue working, with no heavy lifting. He gave her more samples of Skelaxin. In the event that she did not improve over the next week, he recommended physical therapy, as well as further diagnostic studies.
24. Plaintiff returned to Dr. Hankley on February 27, 2003 with reports of ongoing problems. At that time, Dr. Hankley recommended an MRI, as well as additional physical therapy. Following the MRI, on March 7, Dr. Hankley reviewed the MRI results and determined that there were no focal changes from the prior MRI, except for some marrow edema at L-4. Dr. Hankley altered plaintiff's medications on that date, recommended additional physical therapy, and also an EMG.
25. The EMG was normal, which indicated no nerve root impingement. At plaintiff's request, Dr. Hankley referred plaintiff to Dr. Goebel for a surgical evaluation. Dr. Goebel examined plaintiff on May 22, 2003 and assessed myofascial pain, and again determined plaintiff was not a surgical candidate.
26. Dr. Goebel's testimony shows that he agreed that the FCE results show plaintiff meets the physical demands of her position, with the exception of bending and stooping. He further testified that it is possible that she has greater physical capacity than demonstrated on the FCE, in light of indications she did not give maximum effort. In his opinion, plaintiff has the capacity to work, and has no permanent impairment rating.
27. Dr. Hankley last saw plaintiff on May 29, 2003. At that time, plaintiff was not experiencing pain, although she did advise Dr. Hankley that she continued to experience intermittent left low back pain. However, this was an improvement from her prior condition. Dr. Hankley assessed plaintiff with myofascial pain, and further assessed zero percent (0%) permanent partial impairment of her spine. He released her to return to work without restriction.
28. Dr. Hankley is board certified in physical medicine and rehabilitation, and is a physiatrist. Dr. Hankley has consistently assessed plaintiff with back strain and myofascial pain. He has consistently released her to continue to work within the restrictions he outlined, and as of the last visit with no restrictions. At no time has he taken plaintiff out of work related to her back complaints.
29. Plaintiff subsequently sought unauthorized medical treatment from Dr. James Hoski on April 6, 2004. Dr. Hoski ordered an EMG, as well as cervical and thoracic MRIs. Dr. Hoski determined that plaintiff was not a candidate for surgery and suspected Plaintiff was experiencing pain due to facet arthropathy. However, when he treated plaintiff with cortisone injections on April 7, 2004, and the same gave her no relief, Dr. Hoski ruled this out. Dr. Hoski admitted that he did not have knowledge of plaintiff's prior treatment and that he did not know whether plaintiff would require ongoing treatment, but he would defer to assessment by a pain specialist. Neither Dr. Hoski nor Dr. Maxwell addressed the issue of permanent partial impairment or physical capacity.
30. After careful consideration of the opinions expressed by all the physicians who testified in this matter, the greater weight of the evidence shows that plaintiff sustained back strains as a result of the two incidents at work and that her ongoing symptoms are due to myofascial pain. She is not a candidate for surgery, and Dr. Hankley and Dr. Goebel have no further treatment to offer. The treatment by a pain specialist, as recommended by Dr. Hoski and Dr. Maxwell, would be a reasonable step to take to help plaintiff manage her pain.
31. In July 2003, plaintiff's work status changed to PRN, or "call as needed." This change was discussed with Sandra Sayles. Plaintiff requested part time work, but Ms. Sayles responded that they did not have anything available, so plaintiff resorted to the PRN option. During this time period, plaintiff testified that she continued to have back problems. As a result, she tried to protect her back by avoiding lifting. After July 2003, plaintiff testified that her PRN status changed, but she continued to work off and on up until May 2004.
32. On May 11, 2004, plaintiff applied for Family Medical Leave status. As part of the application, she was required to obtain a certificate from a treating physician describing the medical facts to support certification, including a brief statement as to how the medical facts meet the criteria of a particular category. According to plaintiff, her family physician provided such a certificate, although the same does not appear to be in evidence in this case.
33. Although plaintiff identified a total of 41 days that she alleges she missed as a result of her work injuries, the unplanned absence forms only indicate three times during which plaintiff reported back problems. Given the information contained on the unplanned absence forms, plaintiff's testimony regarding the dates she missed related to her back condition is deemed not credible. Furthermore, there was no medical testimony presented demonstrating that plaintiff was not able to perform the duties of her position. The evidence that plaintiff has continued to work as a psych tech contradicts her claim that is unable to work in this position.
34. There is insufficient evidence of record to determine by its greater weight that plaintiff is entitled to indemnity benefits related to her injuries of December 20, 2000 or January 31, 2003. At all times she has been released to work by her treating physicians, and the employer has had work available within her restrictions.
35. Plaintiff's prosecution of this matter are not without reason and is not indicative of stubborn, unfounded litigation.
 * * * * * * * * * * *
Based on the foregoing findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff has failed to prove by the greater weight of the evidence that she is entitled to any indemnity compensation related to the injuries sustained in her employment with defendant on December 20, 2000 and/or January 31, 2003. N.C. Gen. Stat. § 97-29.
2. The greater weight of the evidence shows that the independent medical examination by Dr. Maxwell, which had been approved by Deputy Commissioner Garner was reasonable and therefore defendant should pay for the same. The examination by Dr. Hoski was not approved in advance. The same, while not essential, was a reasonable step for plaintiff to take to seek further evaluation to obtain pain relief following the second incident at work, and therefore should be approved. N.C. Gen. Stat. §§ 97-2(19), 97-25.
3. Per the recommendations of Dr. Hoski, and considering plaintiff's subjective pain complaints, it is reasonably necessary to refer plaintiff to a pain specialist for further evaluation and assessment. Further surgical consultation is not necessary at this time, as plaintiff is not a surgical candidate. N.C. Gen. Stat. §§ 97-2(19), 97-25.
4. Because plaintiff's prosecution of this matter is not without reason, and is not indicative of stubborn, unfounded litigiousness, defendant is not entitled to an award of attorney's fees as a sanction pursuant to N.C. Gen. Stat. §97-88.1.
 * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Plaintiff's claim for benefits for wage loss is DENIED.
2. Defendant shall pay the prior unauthorized medical expenses incurred by plaintiff as a result of her compensable injuries of December 20, 2000 and January 31, 2003, including the independent medical examinations by Dr. Maxwell and Dr. Hoski and tests ordered by Dr. Hoski.
3. Based upon the recommendations of Dr. Hoski, defendant shall select a pain specialist, to further evaluate plaintiff and provide any reasonably necessary treatment to help give plaintiff pain relief or better pain management.
4. Defendant shall pay the cost.
This the 10th day of May 2006
 S/_______________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_______________ LAURA K. MAVRETIC COMMISSIONER